```
          IN THE UNITED STATES DISTRICT COURT
             FOR THE DISTRICT OF NEW JERSEY
```

| | |
|---|---|
| ANNE MARIE WALLACE, | HONORABLE JEROME B. SIMANDLE |
| Plaintiff, | |
| v. | Civil No. 13-6755 (JBS) |
| COMMISSIONER OF SOCIAL SECURITY, | **OPINION** |
| Defendant. | |

APPEARANCES:

Adrienne Freya Jarvis, Esq.
800 North Kings Highway
Suite 304
Cherry Hill, NJ 08034
    Attorney for Plaintiff Anne Marie Wallace

Paul J. Fishman
UNITED STATES ATTORNEY
    By: David L. Brown
        Esther Kim
        Special Assistant U.S. Attorneys
Social Security Administration
Office of the General Counsel
26 Federal Plaza, Room 3904
New York, NY 10278
    Attorneys for Defendant Commissioner of Social Security

**SIMANDLE**, Chief Judge:

**I. INTRODUCTION**

    This matter comes before the Court pursuant to 42 U.S.C. § 405(g) for review of the final decision of the Commissioner of the Social Security Administration denying Plaintiff Anne Marie Wallace's application for disability insurance benefits under Title II of the Social Security Act, 42 U.S.C. § 401, <u>et</u> <u>seq.</u> (the "Act").

Plaintiff argues that the finding of the Administrative Law Judge ("ALJ") regarding her residual functional capacity is not supported by substantial evidence because the ALJ did not account for the total limiting effects of her narcolepsy, and she seeks remand to the ALJ for further consideration. Plaintiff also argues that the ALJ erred at step five of the sequential analysis because the ALJ failed to apprise her of her right to cross-examine the vocational expert, and moreover, the vocational expert's testimony conflicted with the Dictionary of Occupational Titles ("DOT").

For the reasons discussed below, the Court will vacate the Commissioner's final decision and remand the matter for further proceedings.

**II. BACKGROUND**

**A. Procedural History**

Plaintiff filed an application for disability insurance benefits on December 22, 2009, alleging an onset of disability on September 30, 2009. (R. at 11.) The claim was denied, as was a request for reconsideration. (Id.) Hearings were held on June 29, 2011 and December 6, 2011 before the ALJ, Jonathan L. Wesner. (Id.) Plaintiff appeared and elected to give testimony at both hearings without representation. (Id.) On January 24, 2012, the ALJ denied Plaintiff's appeal at step five of the sequential analysis, finding that Plaintiff was capable of performing jobs that existed in significant numbers

2

in the national economy. (R. at 24-26.) The Appeals Council denied Plaintiff's request for review. (R. at 1-4.) Plaintiff then filed the instant action.

### B. Medical History

The following are facts relevant to the present motion. Plaintiff was 43 years-old as of the date of Decision with a ninth grade education, and she had past work experience as a truck driver. Dr. Vedat Obuz began treating Plaintiff in late 2004 for various health issues including narcolepsy, sleep apnea, hyperglycemia, hypothyroidism, obesity and pain in both legs. (R. at 246, 390.) In the fall of 2008, Plaintiff complained of slight fatigue and Dr. Obuz referred her to the Deborah Heart and Lung Center for a sleep study. (R. at 246.) Following a sleep study in June, 2009, Plaintiff was diagnosed with unspecified hypersomnia and narcolepsy by a multiple sleep latency test. (Id.; R. at 374.) Dr. Obuz noted that despite treatment and medications, Plaintiff's condition continued to deteriorate and opined that she was "no longer able to maintain functionality to continue working. Failure to succumb to the need for sleep now becomes involuntary. Therefore, she is currently unable to keep or maintain a set time schedule with regularity." (R. at 246.) In November, 2011, Dr. Obuz found that Plaintiff remained "disabled" due to narcolepsy and her other medical conditions. (R. at 486.)

Plaintiff underwent a series of medical tests from 2009 to 2011,

3

most of which showed normal results. A pulmonary function test on November 23, 2009 revealed "[n]ormal lung function, as indicated by the lack of a significant obstructive impairment or restrictive defect." (R. at 400.) An EMG of Plaintiff's left arm and left leg on May 28, 2010 showed no abnormalities. (R. at 427.) Following neurological testing on that same date, Dr. Timothy Dunn explained that Plaintiff's "nerve conduction/EMG did not show any signs of neuropathy. Therefore, it is difficult for me to say whether she actually has any neurological cause for her lower extremity pain symptoms." (R. at 430.) A MR of the brain on July 14, 2011 found "very subtle increased signal, which has uncertain clinical significance and etiology" in the periventricular white matter. (R. at 493.)

   Plaintiff underwent two consultative exams as part of her claim for benefits. Following an internal medicine evaluation on April 22, 2010, Dr. Ken Klausman noted that Plaintiff has a history of diabetes, depression, COPD, narcolepsy, and back pain. (R. at 413.) Dr. Klausman observed that "claimant walks with a normal gait without the use of a handheld assistive device," "[s]he is able to get on and off the examining table without difficulty," but had "moderate difficulty going from lying down to sitting up." (R. at 415.) Plaintiff's lungs were "clear to auscultation and percussion anteriorly/posteriorly without evidence of rales, rhonchi or wheezing." (Id.) Dr. Klausman found Plaintiff's fine hand motor movements within normal limits and

4

noted her ability to pick up a coin and make a fist with both hands. (Id.) Plaintiff exhibited a normal range of motion in the lumbar spine and full knee strength. (Id.) Plaintiff could walk heel-to-toe and tandem walk without difficulty. (Id.) Dr. Klausman observed no neurological abnormalities except "decreased sensation in a stocking distribution for light touch and pinprick of both feet." (R. at 416.)

The Physical Residual Functional Capacity Assessment completed by state medical consultant, Jyothsna Shastry, on May 5, 2010 indicates diagnoses of diabetes with neuropathy, narcolepsy, and obesity and notes credible complaints of leg pain. (R. at 422.) The medical consultant found that Plaintiff could lift and carry twenty-five pounds frequently and fifty pounds occasionally, could sit for about six hours out of eight hours during a workday, had unlimited push/pull abilities, could frequently balance, stoop, kneel, crouch, and crawl, and had no visual, communicative, or manipulative limitations. (R. at 418-21.) The medical consultant further found that Plaintiff could stand and/or walk for at least two hours in an eight-hour workday, could occasionally climb ramps and stairs, but could never climb ladders, ropes, and scaffolds, and must avoid all exposure to hazards, such as machinery and heights. (Id.)

### C. ALJ Decision

In a written decision dated January 24, 2012, the ALJ determined

5

that Plaintiff was not disabled at any time through the date of decision. (R. at 28.) He found that Plaintiff had not engaged in substantial gainful activity since September 30, 2009, the alleged onset date, and concluded that she suffered from severe impairments, including narcolepsy, fibromyalgia, diabetes mellitus, obesity, and apnea. (R. at 27.) The ALJ found that Plaintiff's combination of impairments did not meet or medically equal the severity of an impairment listed in the regulations. He described her residual functional capacity ("RFC") as follows:

> the claimant retains the residual functional capacity to perform the exertional demands of sedentary work, or which is generally performed while sitting and never requires lifting in excess of ten pounds (20 CFR 404.1567). The claimant is able to lift/carry less than ten pounds frequently and ten pounds occasionally; can stand and/or walk for at least two hours in an eight hour workday; is able to sit for six hours in an eight hour workday; can occasionally climb ramps and stairs, but can never climb ladders, ropes, and scaffolds; and must avoid all exposure to hazards, such as machinery and heights.

(Id.) Importantly, the ALJ determined that "the claimant's allegations regarding her limitations are not totally credible for the reasons set forth in the body of the Decision." (Id.) The ALJ explained that "claimant's reported restrictions are not consistent with the preponderance of the medical evidence as well as the claimant's testimony at the hearing." (R. at 22.) The ALJ noted that "diagnostic studies demonstrate that the impairments are not as debilitating as suggested by the claimant and fail to record physiologic abnormalities of a kind and level which would support

6

the claimant's complaints." (R. at 18.)

Specifically, the ALJ discussed glucose levels near the normal range, pulmonary function testing that revealed only mild obstruction, an EMG study showing no abnormalities in the left arm or leg, a polysomnography report recording sleep efficiency of 95 percent, an "extensive work-up done from a neurologic perspective" which did not show any significant abnormalities, and a state consultative exam finding that Plaintiff could perform the full range of medium work. (R. at 18-20.) The ALJ explained that "the claimant's self assessment [sic] of her activities of daily living and functional abilities in disability questionnaires is indicative of a fairly active lifestyle and supportive of a residual functional capacity of at least a wide range of sedentary work." (R. at 21.) Notably, the ALJ rejected opinions of treating physician, Dr. Obuz, "that the claimant could not keep or maintain a set time schedule with regularity and is still disabled" because these opinions "are clearly inconsistent" with Plaintiff's self-reported activities of daily living, an internal medicine evaluation report which noted few physical findings that would preclude a wide range of sedentary work, and Dr. Dunn's neurological assessment which was "essentially normal." (R. at 23.)

After finding Plaintiff unable to perform any past relevant work and hearing testimony from Louis Szollosy, a vocational expert ("VE"),

7

the ALJ found that jobs existed in significant numbers in the national economy that Plaintiff could perform. (R. at 27-28.) The VE stated that an individual of Plaintiff's age, education, and past relevant work, with the residual functional capacity determined by the ALJ, could perform the "unskilled, sedentary jobs" of bench assembly, information clerk, surveillance systems monitor, and order clerk. (R. at 26.) Accordingly, the ALJ ruled that Plaintiff was not disabled at any time through the date of Decision. (R. at 28.)

**III. STANDARD OF REVIEW**

This Court reviews the Commissioner's decision pursuant to 42 U.S.C. § 405(g). The Court's review is deferential to the Commissioner's decision, and the Court must uphold the Commissioner's factual findings where they are supported by "substantial evidence." 42 U.S.C. § 405(g); Fargnoli v. Massanari, 247 F.3d 34, 38 (3d Cir. 2001); Cunningham v. Comm'r of Soc. Sec., 507 F. App'x 111, 114 (3d Cir. 2012). Substantial evidence is defined as "more than a mere scintilla," meaning "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. 389, 400 (1971); Hagans v. Comm'r of Soc. Sec., 694 F.3d 287, 292 (3d Cir. 2012) (using the same language as Richardson). Therefore, if the ALJ's findings of fact are supported by substantial evidence, the reviewing court is bound by those findings, whether or not it would have made the same

8

determination. Fargnoli, 247 F.3d at 38. The Court may not weigh the evidence or substitute its own conclusions for those of the ALJ. Chandler v. Comm'r of Soc. Sec., 667 F.3d 356, 359 (3d Cir. 2011).

**IV. DISCUSSION**

Plaintiff argues that substantial evidence does not support the ALJ's determination of the functional impact of Plaintiff's narcolepsy. Plaintiff also contends that the ALJ failed to afford Plaintiff an opportunity to cross-examine the vocational expert. Moreover, Plaintiff asserts that the ALJ erred in relying on the occupations of surveillance system monitor and order clerk at step five, that the ALJ failed to comply with SR-00-4p, and that substantial evidence does not support the VE's estimate of the number of jobs Plaintiff could perform.

**A. The ALJ did not err in considering the functional impact of Plaintiff's narcolepsy on her residual functional capacity**

Plaintiff argues that substantial evidence does not support the ALJ's residual functional capacity assessment because the ALJ did not consider the total limiting effects of Plaintiff's narcolepsy. Plaintiff contends that the ALJ only accounted for Plaintiff's narcolepsy in his determination that Plaintiff could not climb ladders, ropes, or scaffolds and could not be exposed to any hazard, such as machinery or heights. Plaintiff asserts that the ALJ's findings are logically inconsistent and contradictory because he

9

found at step two that Plaintiff has "severe" narcolepsy. According to Plaintiff, it is unreasonable to find that Plaintiff has "severe" narcolepsy, "yet disregard its most obvious work-related limitation, namely, a reduced ability or inability to perform any work task when drowsy or asleep." (Pl. Br. [Docket Item 12] at 6.) Plaintiff also contends that the ALJ erred in his assessment of Plaintiff's credibility and erroneously disregarded certain opinions of treating physician, Dr. Obuz.

Plaintiff has provided no authority to support the proposition that an individual with severe narcolepsy cannot perform any sedentary work task. While it is self-evident that one cannot perform work while asleep, Plaintiff has not identified anything in the record that the ALJ ignored or rejected without explanation regarding the frequency and extent of Plaintiff's involuntary sleep. There is thus no basis for this Court to conclude that the ALJ's findings are logically inconsistent or contradictory.

Instead, the ALJ's findings regarding Plaintiff's residual functional capacity are supported by substantial evidence. Based on Plaintiff's self-reported activities of daily living, the ALJ concluded that she maintained "a fairly active lifestyle" and noted that she is able to make meals, go to appointments, do laundry, care for her son, drive a car, go food shopping, and handle her finances. (R. at 21.) The ALJ found Plaintiff's reported restrictions to be

10

inconsistent with the objective medical evidence in the record and her testimony. It disregards the ALJ's findings and the evidentiary record for Plaintiff to argue that the ALJ's residual functional capacity assessment was based on the fact that Plaintiff did not fall asleep during a consultative exam. Where, as here, alleged symptoms suggest greater functional limitations than can be demonstrated by objective evidence, the ALJ is directed to consider other evidence such as Plaintiff's daily activities, the location, duration, frequency, and intensity of the symptoms, precipitating and aggravating factors, medication, and treatment. 20 C.F.R. § 404.1529(c)(3). The ALJ's assessment was based on a detailed and well-reasoned examination of the evidence in the record which the ALJ found to contradict Plaintiff's reports of frequent or constant involuntary sleep.

Likewise, the ALJ did not err in his assessment of Plaintiff's credibility. SSR 96-7p requires the ALJ to make credibility determinations grounded in the evidence and in light of the entire case record. SSR 96-7p, 1996 WL 374186, at *1 (S.S.A. July 2, 1996). The ALJ cannot simply state that the "allegations have been considered" or that they categorically are not credible. Id. at *2. "The determination or decision must contain specific reasons for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual

and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight." Id. Here, the ALJ's written decision is sufficiently specific to make clear what weight he gave Plaintiff's statements and the corresponding reasons. The ALJ explained in nearly four pages why he questioned the severity of Plaintiff's impairments. See Martin v. Comm'r of Soc. Sec., 547 F. App'x 153, 159 (3d Cir. 2013) (upholding the ALJ's credibility determination when the ALJ (1) stated the claimant's testimony was not credible because it did not comport with the weight of the evidence in the file and (2) described the contrary evidence). Moreover, the ALJ did not entirely disregard Plaintiff's alleged restrictions and noted that "[w]hile I believe that the claimant does have some symptoms and limitation of function, it is not to the extent that the claimant alleges." (R. at 22.)

Nor did the ALJ err in rejecting certain opinions of treating physician, Dr. Obuz. The regulations provide that the ALJ may reject the opinion of a treating physician when it is not supported by medically acceptable clinical or diagnostic techniques or inconsistent with other substantial evidence regardless of the treatment relationship. See 20 C.F.R. § 404.1527(d)(2)-(3); see also Salles v. Comm'r of Soc. Sec., 229 F. App'x 140, 149 (3d Cir. 2007) ("Because the consultative physician's observations were more consistent with the weight of the evidence, the ALJ properly afforded

12

them greater weight than the opinion of the treating physician."). Here, the ALJ made clear that he rejected Dr. Obuz's opinions that Plaintiff could not maintain a set time schedule with regularity and that she is disabled because these opinions "are clearly inconsistent with the claimant's self-reported activities of daily living." (R. at 23.) The ALJ further explained that Dr. Obuz's opinions conflicted with the objective medical evidence in the record documenting few if any physical or neurological abnormalities. The ALJ specifically referenced the lack of physical findings by Dr. Klausman and Dr. Dunn's neurological assessment which was "essentially normal." (R. at 23.) Accordingly, the ALJ sufficiently explained his reasons for questioning Plaintiff's credibility and for rejecting certain of Dr. Obuz's opinions. The Court concludes that his findings regarding Plaintiff's residual functional capacity are supported by substantial evidence.

### B. The ALJ erred in failing to afford Plaintiff an opportunity to cross-examine the vocational expert

Plaintiff next argues that the ALJ erred in failing to afford Plaintiff an opportunity to cross-examine the vocational expert. Defendant responds that "Plaintiff had and took the opportunity to interact with the VE and ensure that the information presented [to the vocational expert] was complete and full." (Def. Opp. [Docket Item 15] at 8.)

Consistent with due process, claimants must be given an opportunity to cross-examine the vocational expert. See Wallace v. Bowen, 869 F.2d 187, 192 (3d Cir. 1989); Howe v. Astrue, 12-93, 2013 WL 593975, at *3 (W.D. Pa. Feb. 14, 2013). The Third Circuit has held that "an opportunity for cross-examination is an element of fundamental fairness of the hearing to which a claimant is entitled under section 205(b) of the Social Security Act, 42 U.S.C. § 405(b)." Wallace, 869 F.2d at 192 (remanding where claimant did not have opportunity to cross-examine state consultative physicians who submitted post-hearing reports); Haddock v. Apfel, 196 F.3d 1084, 1090 (10th Cir. 1999) ("Claimants have a right to cross-examine vocational experts as a part of procedural due process."); Townley v. Heckler, 748 F.2d 109, 114 (2d Cir. 1984) (holding that use of post-hearing report from vocational expert violated claimant's due process rights where claimant was denied opportunity to examine vocational report, no additional hearing was held, and claimant was "denied his due process rights to cross-examine the expert and to present rebuttal evidence"); Howe, 2013 WL 593975, at *3 ("[A] claimant has the right to cross-examine vocational experts as a part of procedural due process."); Glenn v. Comm'r of Soc. Sec., 12-11433, 2013 WL 3466964, at *16 (E.D. Mich. July 10, 2013) ("The social security regulations require that the ALJ afford Plaintiff an opportunity to question the VE.") (citing 20 C.F.R. § 404.950(e)).

14

See also I-2-6-74. Testimony of a Vocational Expert, HALLEX I-2-6-74 (S.S.A. Dec. 12, 2013), available at http://www.ssa.gov/OP_Home/hallex/I-02/I-2-6-74.html ("The claimant and the representative have the right to question the VE fully on any pertinent matter within the VE's area of expertise.").

Moreover, the Third Circuit has held that the ALJ must take a more heightened and active role when the claimant is unrepresented. Livingston v. Califano, 614 F.2d 342, 345 (3d Cir. 1980); Dobrowolsky v. Califano, 606 F.2d 403, 407 (3d Cir. 1979); Gauthney v. Shalala, 890 F. Supp. 401, 411 (E.D. Pa. 1995) ("[T]he ALJ's failure to fulfill his 'heightened duty' to clarify the evidentiary gaps in the record, and notify plaintiff of his right to cross-examine the expert at a supplemental hearing, warrants a remand to the Secretary for further administrative proceedings to clarify the record."). In Dobrowolsky, on facts comparable to the present action, the Third Circuit observed a "less-than-effective attempt by [claimant] to challenge the conclusion of the vocational expert" where the vocational expert was not questioned on the effect of the claimant's inability to sleep on his ability to perform certain sedentary jobs and hold substantial gainful employment. Dobrowolsky, 606 F.2d at 408. The Court of Appeals noted that "[t]he ability to engage in substantial gainful employment, as indicated in that case, means more than the ability to do certain of the physical and mental acts required in the job;

15

the claimant must be able to sustain the activity through continuous attendance in a regular work-week." Id.

Here, the Court finds that Plaintiff was not notified of or given an opportunity to cross-examine the vocational expert and the ALJ failed to satisfy his "heightened duty" to clarify the record. At no point, did the ALJ inform Plaintiff of her right to cross-examine the vocational expert. In fact, the ALJ discouraged Plaintiff from objecting to the vocational expert's testimony.[1] Plaintiff's opportunity to "interact" with the vocational expert as noted by Defendant was insufficient to satisfy due process. The only clarification Plaintiff provided to the vocational expert involved additional information about her past work as a truck driver and her appointment with psychologist, Dr. Coffrey, after Plaintiff believed the vocational expert misinterpreted her medical information. This falls well short of an opportunity to cross-examine the vocational expert.

Moreover, the ALJ did not sufficiently develop the record or challenge the vocational expert's testimony. The ALJ's brief

---

[1] After introducing the vocational expert, the ALJ stated, "if you had a lawyer, I would ask the lawyer if he would agree only that he may give an opinion. Not what is going to be, because I don't know what it's going to be. And even if I would – even if the attorney would object to his ability, the only basis for him to object would be he's not qualified to give the opinion, all right . . . . So even if your lawyer objected, if you had one, I would say I'm going to let him testify because I've read his resume, I know his background and I've heard his testimony in many, many cases so I know what he's – I know he's okay." (R. at 43-44.)

16

questioning of the vocational expert focused on Plaintiff's physical limitations. The ALJ only asked one question regarding the impact of Plaintiff's narcolepsy. Despite the vocational expert's response that the hypothetical individual would not be able to sustain any competitive employment at any exertional level, the ALJ failed to ask any follow up questions or inquire further regarding a hypothetical individual with severe narcolepsy.[2]

The Court finds that Plaintiff was prejudiced by the above deficiencies because the vocational expert acknowledged that Plaintiff would be "preclude[d]" from substantial gainful employment if she fell asleep 20 percent of a workday, yet Plaintiff had no opportunity to further develop the impact of her narcolepsy on her ability to maintain competitive employment.[3] (R. at 51.) For example, the vocational expert was not asked if Plaintiff would be precluded

---

[2] The ALJ's questioning of the vocational expert regarding the impact of Plaintiff's narcolepsy consisted of the following:
>   Q:   Here in these records it shows she has problems staying awake and if she would fall asleep 20 percent of a workday, what would happen to her employability?
>   A:   Basically that would preclude it because she wouldn't be performing and functioning at least in an 80 percent capacity to be competitively employed.

(R. at 51.)

[3] Although the ALJ is not required to "submit to the vocational expert every impairment *alleged* by a claimant[,] . . . the ALJ must accurately convey to the vocational expert all of a claimant's *credibly established limitations*." Rutherford v. Barnhart, 399 F.3d 546, 554 (3d Cir. 2005) (emphasis in original). The ALJ's hypothetical to the vocational expert regarding an individual who "would fall asleep 20 percent of a workday" is inconsistent with the limitations credited in his written opinion. It is thus unclear to what extent the ALJ found Plaintiff restricted by her narcolepsy.

17

from employment if she fell asleep for five or ten percent of a workday, or if the duration, not just the frequency, of her narcoleptic episodes would be relevant to her employability. The record is clear that while the ALJ did not believe Plaintiff's symptoms and limitations of function to the extent alleged, the ALJ recognized some restrictions as the result of her narcolepsy. The ALJ failed to develop in his questioning of the vocational expert or explain in his written opinion the extent to which Plaintiff's limitations – as the ALJ found credible and consistent with record as a whole – impacted her ability to perform the jobs identified. If the ALJ believed that Plaintiff's narcolepsy had no impact on her functioning and employability, then he should have made that clear. Instead, the Court is left to speculate as to why the ALJ inquired about the impact of narcolepsy at step five, yet ignored or rejected the vocational expert's response in his written decision.[4] Therefore, the Court will remand for further

---

[4] The ALJ stated in his decision that "[a]dditional hypothetical scenarios involving different limitations in an individual's ability to perform work related activities were also presented to the vocational expert. As these scenarios fall outside of the claimant's residual functional capacity as determined above, the specific presentations need not be referred to in the body of this Decision." (R. at 26.) It may be inferred that this section of the decision refers to the hypothetical regarding sleep during the workday. However, in light of the ALJ's failure to inform Plaintiff of her right to cross-examine the vocational expert and to develop the record, such a general, conclusory statement is inadequate to clarify the record and support a finding of substantial evidence.

clarification of the effect of Plaintiff's narcolepsy on the step five analysis.[5]

**V. Conclusion**

    For the foregoing reasons, the Court finds that substantial evidence in the record supports the ALJ's determination regarding Plaintiff's residual functional capacity. However, the ALJ failed to inform Plaintiff of her right to cross-examine the vocational expert and failed to fulfill his heightened duty to develop the record in the case of an unrepresented claimant, which caused prejudice to Plaintiff. Therefore, the Court will vacate the Commissioner's final decision and remand the matter for further proceedings. An accompanying Order will be entered.

| | |
|---|---|
| **November 21, 2014** | **s/ Jerome B. Simandle** |
| Date | JEROME B. SIMANDLE |
| | Chief U.S. District Judge |

---

[5] Having found remand necessary due to the ALJ's failure to inform Plaintiff of her right to cross-examine the vocational expert and failure to develop the record, the Court will not address Plaintiff's additional arguments that the vocational expert had a conflict of interest in Plaintiff's case and that the jobs identified by the vocational expert exceeded the exertional level of sedentary work, were inconsistent with one and two-step instructions, and did not exist in the numbers stated.